UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ACAC DOWNTOWN, LLC, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> CINCINNATI INSURANCE CO. INC., *et al.*, <br><br> *Defendants*. | CASE NO. 3:20-cv-00049 <br><br> MEMORANDUM OPINION <br><br> JUDGE NORMAN K. MOON |

The plaintiffs in this case are companies that own or operate health clubs and trampoline parks. They have sued their insurer for their losses stemming from the COVID-19 pandemic and several state governments' orders temporarily suspending certain business in an effort to combat COVID-19. Because the unambiguous language of the relevant insurance policy requires direct, physical damage to property to secure coverage, and because plaintiffs alleged no such damage to covered property, their claims are dismissed. In light of published Fourth Circuit precedent on the issue, this Court will decline plaintiffs' request to certify a question concerning the relevant policy language to the Supreme Court of Virginia.

Background

Plaintiffs are businesses that own and/or operate health clubs and trampoline parks, with facilities located in Virginia, Maryland, and Pennsylvania. Dkt. 30 ("Am. Compl.") ¶ 19. Plaintiffs purchased an insurance policy from Cincinnati Insurance Company ("CIC"), which includes business property insurance (the "Policy"). *Id.* ¶ 20.

1

The relevant coverage for purposes of this case is the Building and Personal Property Coverage Form, and the Business Income (and Extra Expense) Coverage Form. Dkt. 30-1 at ECF 54, 163. The Building and Personal Property Coverage Form contains the following language:

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by ***direct "loss" to property*** at a "premises" caused by or resulting from any Covered Cause of Loss.

Dkt. 30-1 at ECF 71 (emphasis added).

The Business Income (and Extra Expense) Coverage Form contains the following language:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by ***direct "loss" to property at "premises"*** which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown in the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss.

Dkt. 30-1 at ECF 163 (emphasis added).

The Policy defines a "loss" as "accidental *physical* loss or accidental *physical* damage." Dkt. 30-1 at ECF 91, 171 (emphases added).

A "Covered Cause of Loss" means "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." *Id.* at ECF 58.

In addition, Civil Authority coverage provides that "[w]hen a Covered Cause of Loss causes damage to property other than Covered Property at a 'premises, we will pay for the actual loss of 'Business Income' and necessary Extra Expense you sustain caused by action of civil authority that prohibited access to the 'premises', provided that both of the following apply:

> (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

> (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property …

*Id.* at ECF 72.

Plaintiffs allege that, "[a]s a result of the 2020 COVID-19 pandemic, Plaintiffs were ordered by the state governments in Virginia, Maryland, and Pennsylvania to close all of their facilities, resulting in lost business income." Am. Compl. ¶ 22. COVID-19 has infected many millions of Americans and over a million Americans have died from the virus. *Id.* ¶ 23. Plaintiffs also allege that they incurred expenses cleaning their facilities in response to the COVID-19 pandemic. *Id.* ¶ 24.

In March 2020, Plaintiffs gave notice to CIC of a claim related to the COVID-19 pandemic. *Id.* ¶ 25. Plaintiffs detailed alleged lost business income and fixed expenses of $6,974,388, extra expenses incurred in response to the COVID-19 pandemic of $8,232,520, and likely lost net income of $867,000, resulting in a total asserted loss of $16,073,908. *Id.* ¶ 32; *see also* Dkt. 30-6. In June 2020, CIC denied Plaintiffs' claim. Am. Compl. ¶ 38.

Plaintiff Atlantic Coast Athletic Clubs, Inc., subsequently filed suit against CIC and Brent Showalter, an employee of CIC, in the Circuit Court for the City of Charlottesville. Dkt. 1. That initial complaint raised claims of breach of contract and breach of the implied covenant of good faith and fair dealing, against CIC, negligence against Showalter, and fraud against CIC and Showalter. Subsequently, CIC removed the case to this Court asserting that this Court had diversity jurisdiction because Showalter was fraudulently joined as a defendant and his citizenship could be disregarded for purposes of the diversity jurisdiction. Dkt. 1. Plaintiff filed a motion to remand. Dkt. 6. This Court subsequently issued a memorandum opinion denying the

motion to remand. Dkt. 21. In the decision, this Court concluded that, as Plaintiff "will not be able to establish its negligence or fraud claims as against Defendant Showalter, the Court can disregard Showalter's citizenship for purposes of its jurisdictional analysis. Absent Showalter, there is complete diversity of the parties." *Id.* at 8. Therefore, the Court held that Plaintiff's motion to remand was denied. *Id.*

Plaintiffs then filed the operative First Amended Complaint. The original Plaintiff Atlantic Coast Athletic Clubs, Inc. was no longer listed as a named plaintiff, and in its stead, Plaintiffs included fifteen health and athletic clubs and trampoline parks. *See* Am. Compl. The Amended Complaint also continues to list Showalter as a defendant and includes the claims against him—recognizing that the Court held that those claims could not proceed, but Plaintiffs "note their objection" to that ruling, and state that they "includ[e] … Showalter in the First Amended Complaint out of an abundance of caution to preserve the issue for later review." *Id.* at 2 n.2.

In their amended complaint, Plaintiffs raise four causes of action. First, Plaintiffs raise a breach of contract claim against CIC. *Id.* ¶¶ 69–81. Second, Plaintiffs bring a claim for breach of the implied covenant of good faith and fair dealing against CIC. *Id.* ¶¶ 82–86. Third, Plaintiffs raise a claim of negligence solely against Showalter. *Id.* ¶¶ 87–93. Fourth and finally, Plaintiffs include a claim of fraud against CIC and Showalter. *Id.* ¶¶ 94–102.

CIC filed a motion to dismiss the Amended Complaint, which has been fully briefed. Dkts. 47, 48, 49, 51. Plaintiffs have filed a motion to certify question to the Supreme Court of Virginia, which is also fully briefed, and is opposed by CIC. Dkts. 50, 52. The Court heard oral argument on the motions, which are ripe for decision.

Standard of Review

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). It does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "This pleading standard does not require detailed factual allegations." *ACA Fin. Guar. Corp.*, 917 F.3d at 211 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, "[t]o meet the Rule 8 standard and 'survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Nadendla v. WakeMed*, 24 F.4d 299, 305 (4th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *King*, 825 F.3d at 212. However, the Court need not "accept the legal conclusions drawn from the facts," or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United. Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotes omitted).

Applicable Law

In Virginia,[1] the interpretation of an insurance policy presents a question of law. *Nationwide Mut. Fire Ins. Co. v. Erie Ins. Exchange*, 798 S.E.2d 170, 173 (Va. 2017). Thus,

---

[1] There is no dispute that Virginia law governs interpretation of the policy. Dkt. 48 at 5 n.5; Dkt. 49 at 1.

"when the language in an insurance policy is clear and unambiguous, courts … give the language its plain and ordinary meaning and enforce the policy as written." *Selective Ways Ins. Co. v. Crawl Space Door Sys., Inc.*, 162 F. Supp. 3d 547, 551 (E.D. Va. 2016). The Court must "adhere to the terms of a contract of insurance as written, if they are plain and clear and not in violation of law or inconsistent with public policy." *Blue Cross & Blue Shield v. Keller*, 450 S.E.2d 136, 140 (Va. 1994). Judicial interpretation of language in insurance policies "should conform to the plain meaning that reasonable insurers and insureds likely would have attributed to the words." *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 354–55 (Va. 2019). Insurance policies, like other contracts, "are to be read as a whole, and meaning is to be given to all provisions, if possible, in order to determine the intent of the parties." *State Farm Fire & Cas. Co. v. Nationwide Mut. Ins. Co.*, 596 F. Supp. 2d 940, 946 (E.D. Va. 2009). A policy provision is ambiguous if, "in context, it is capable of more than one reasonable meaning." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (applying Virginia law). If an ambiguity does exist, "it must be construed against the insurer." *Id.* A policyholder bears the burden to establish that his claim is covered under the policy. *Id.* (citing *Furrow v. State Farm Mut. Ins. Co.*, 375 S.E.2d 738, 740 (Va. 1989), but further explaining that the burden "is not especially onerous").

Reasoning

CIC argues that the Amended Complaint fails to state a claim, because "Plaintiffs seek coverage for purely financial losses sustained as a result of the impact of COVID-19-related orders on their business operations," but "[t]he insurance policy at issue indemnifies against loss or damage to property, such as in the case of a fire or storm." Dkt. 48 at 1. However, CIC continues, COVID-19 "do[es] not damage property," it "hurt[s] people." *Id.* And, CIC contends,

the coverages at issue here "apply only to income losses tied to physical damage to property." *Id.* Because "direct physical loss is a fundamental prerequisite to coverage under the Policy that Plaintiffs cannot satisfy," CIC asserts that the amended complaint should be dismissed. *Id.* The Court agrees with CIC that the amended complaint must be dismissed because Plaintiffs have not stated a plausible claim to relief under the Policy.

This case is controlled by the Fourth Circuit's published opinion in *Uncork and Create LLC v. Cincinnati Insurance Co.*, 27 F.4th 926 (4th Cir. 2022). That case presented another insurance coverage dispute in which the insured plaintiff sought coverage "for lost business income and other expenses resulting from the Covid-19 virus and a related, state-government order temporarily halting non-essential business activities." *Id.* at 928. The Fourth Circuit held, under West Virginia law, that "the policy language requiring a 'physical loss' or 'physical damage' unambiguously covers only losses caused by, or relating to, material destruction or material harm to the covered property." *Id.* And because the insured "did not suffer such a physical loss or damage resulting from the pandemic or government order," the Fourth Circuit affirmed the district court's judgment dismissing the case. *Id.*

In *Uncork*, the Fourth Circuit considered materially similar (if not identical) policy language from CIC, stating that the policy covers "direct 'loss'" to covered property "caused by or resulting from any Covered Cause of Loss," and defining "Covered Causes of Loss" as "direct," "accidental physical loss or accidental physical damage." *Id.* at 929. The court applied West Virginia law, which provides that when a policy term is unambiguous, the court must apply its plain meaning. Accordingly, the court considered the plain meaning of the definition of "Covered Causes of Loss," which are "direct," "accidental physical loss or accidental physical damage." *Id.* at 931. The Fourth Circuit explained that "the plain understanding of the terms

"physical loss" or "physical damage" is "material destruction or material harm." *Id.* at 932. Thus, the Fourth Circuit held that "[t]his policy language is plain and unambiguous." *Id.* And the Fourth Circuit further ruled that "neither the closure order nor the Covid-19 virus caused present or impending material destruction or material harm that physically altered the covered property requiring repairs or replacement so that they could be used as intended." *Id.* at 933. Thus, the court concluded that "the policy's coverage for business income loss and other expenses does not apply to Uncork's claim for financial losses in the absence of any material destruction or material harm to its covered premises." *Id.*

Notably the Fourth Circuit also "observe[d] that [its] holding is consistent with the unanimous decisions by our sister circuits, which have applied various states' laws to similar insurance claims and policy provisions." *Id.* (citing cases from the Second, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits, applying the laws of Texas, New York, Ohio, Illinois, Iowa, California, Oklahoma, and Georgia, reaching similar holdings). *Id.* at 933–34.

To be sure, the Fourth Circuit's decision in *Uncork* applied West Virginia law rather than Virginia law, at issue here. Yet the court did not base its decision on any unique or idiosyncratic feature of West Virginia law, but rather standard principles of interpretation of insurance policies that in all material respects mirror Virginia law. *See Uncork*, 27 F.4th at 931 (citing West Virginia principles that "[w]hen a policy term is unambiguous, we apply its plain meaning as written," but when "a policy term is ambiguous or reasonable capable of more than one meaning, we construe the policy language in favor of coverage and against the insurer"). Virginia law is to the same effect. *Res. Bankshares*, 407 F.3d at 635–36 (describing Virginia principles of insurance policy interpretation). It is unsurprising then, that when pressed at oral argument, Plaintiff's counsel could not identify any unique aspect of West Virginia law that would

8

potentially render the Fourth Circuit's decision in *Uncork* inapplicable to the governing Virginia law in this case.

Moreover, the Fourth Circuit has subsequently applied its *Uncork* decision in summary fashion in numerous unpublished cases raising the same or similar issues under other states' laws. *See, e.g.*, *Cordish Cos., Inc. v. Affiliated FM Ins. Co.*, 2022 WL 1114373 (4th Cir. Apr. 14, 2022) (affirming decision rejecting insured's claim under Maryland law based on *Uncork*, due to failure to plausibly allege physical loss or damage); *Nat'l Coatings & Supplies, Inc. v. Valley Forge Ins. Co.*, 2022 WL 2045334 (4th Cir. June 7, 2022) (affirming decision applying North Carolina law based on *Uncork*, holding that policy's "microbes" exclusion barred coverage); *Summit Hospitality Grp., Ltd. v. Cincinnati Ins. Co.*, 2022 WL 2072759 (4th Cir. June 9, 2022) (affirming decision applying North Carolina law based on *Uncork*, rejecting insured's claim without allegation of physical loss or damage to property); *Bel Air Auto Auction v. Great N. Ins. Co.*, 2022 WL 2128586 (4th Cir. June 14, 2022) (affirming decision applying Maryland law and holding that insured was not entitled to coverage absent direct physical loss or damage based on *Uncork*, and refusing to certify question to Court of Appeals of Maryland); *Golden Corral Corp. v. Ill. Union Ins. Co.*, 2022 WL 3278938 (4th Cir. Aug. 11, 2022) (affirming decision rejecting insured's claim under North Carolina law based on *Uncork*, because insured failed to plausibly allege tangible, physical harm to covered property or a tangible loss of covered property); *Fountain Enters., LLC v. Markel Ins. Co.*, 2022 WL 16630571 (4th Cir. Nov. 2, 2022) (affirming decision rejecting insured's claim under Mississippi, Pennsylvania and Washington law based on *Uncork*, which held that loss of use of fitness centers due to COVID-19 was not a "direct physical loss of or damage to property").

In their briefing, Plaintiffs do not even cite *Uncork* or the Fourth Circuit's unpublished orders applying it, much less attempt to distinguish them. Plaintiffs do recognize, as they must, that "insurance companies have largely been successful in federal courts." Dkt. 49 at 1. However, Plaintiffs argue that the Court should nonetheless rule in their favor for two reasons: (1) because "viruses are physical objects," which, though they can't be seen, "cause losses and damage—both to human life and property," and (2) the "better reasoned opinions" have come out in their favor, and the Supreme Court of Virginia has not squarely addressed the issue in a published opinion. *Id.* Therefore, Plaintiffs also ask that the Court certify the question to the Supreme Court of Virginia.

Plaintiffs mostly rely on one decision from the Eastern District of Virginia for the proposition that, "[t]he phrase 'direct physical loss' has been subject to a spectrum of interpretations in Virginia on a case-by-case basis, ranging from direct tangible destruction of the covered property to impacts from intangible noxious gasses or toxic air particles that make the property uninhabitable or dangerous to use." *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 373 (E.D. Va. 2020); *see also* Dkt. 49 at 8–9. In that court's view, even if a plaintiff's building "was not structurally damaged," it was still plausible that the plaintiff suffered a "direct physical loss when the property was deemed uninhabitable, inaccessible, and dangerous to use by the Executive Orders because of its high risk for spreading COVID-19, an invisible but highly lethal virus." *Elegant Massage*, 506 F. Supp. 3d at 376.

Significantly, however, the district court's decision in *Elegant Massage* was issued well before the Fourth Circuit's opinion in *Uncork*. Moreover, an extensive review of the decisions of other courts in Virginia makes clear that "*Elegant Massage* stands alone." *Carilion Clinic v. Am. Guar. & Liab. Ins. Co.*, 583 F. Supp. 3d 715, 730 (W.D. Va. 2022). While the *Elegant Massage*

10

decision "found the claim for losses resulting from [the COVID-19 pandemic] plausible, likening the claim to those involving 'asbestos, ammonia, odor from methamphetamine lab, or toxic gasses from drywall,'" the Court agrees with authority finding "inapt" that "comparison of the losses in these cases to loss of use of property as a result of COVID-19." *See Carilion Clinic*, 583 F. Supp. 3d at 730–31. That is because, in each of the cases relied upon in *Elegant Massage*, "the property insured by the policy suffered some infirmity that the court found to be a direct physical loss." *Id.* at 731. But where, as here, there is "no infirmity associated with [Plaintiffs'] property," and instead "the claimed cause of loss is the global pandemic," those authorities fail to support Plaintiffs' position. *See id.*

Plaintiffs also argue that their claims "trigger civil authority coverage." Dkt. 49 at 17–19. However, this argument falters for the same reasons. In particular, the civil authority coverage applies "[w]hen ***a Covered Cause of Loss causes damage to property*** other than the Covered Property at a 'Premises'". Dkt. 30-1 at ECF 72 (emphasis added). But again, a "Covered Cause of Loss" means "***direct 'loss'*** unless the 'loss' is excluded or limited in this Coverage Part." *Id.* at ECF 58 (emphasis added). And, again, a "loss" is defined as "accidental *physical* loss or accidental *physical* damage." Dkt. 30-1 at ECF 91, 171 (emphasis added). So there remains the requirement or prerequisite for civil authority coverage that there be a direct physical loss, which Plaintiffs failed to allege here.

Plaintiffs argue that "Virginia law requires that any doubt regarding ambiguities in the Policy must be resolved in Plaintiffs' favor." Dkt. 49 at 13. That's true. But there does not appear to be any ambiguity in the relevant policy provisions, and the Fourth Circuit has concluded that the same policy language was unambiguous under West Virginia law.

11

As CIC argues, while "[d]irect physical loss or damage to property is required for coverage under the Policy," and *Uncork*, *Carilion Clinic* and other decisions have held those words are not ambiguous, Plaintiffs' allegations have failed to "identify any property that suffered any direct physical loss or damage." *See* Dkt. 48 at 18. Plaintiffs offer no reason—and the Court sees none—why the Court should not follow the Fourth Circuit's published decision in *Uncork* as well as persuasive authority such as *Carilion Clinic*, and accordingly the Court will dismiss Plaintiffs' breach of contract claim for failure to plausibly allege any direct physical loss, material destruction or material harm to their covered premises.

Plaintiffs other claims—violation of the implied covenant of good faith and fair dealing, and fraud—also fail.

For one, there cannot be a plausible claim for breach of the implied covenant of good faith and fair dealing where the policy does not afford coverage. *See Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.*, 709 F. Supp. 2d 441, 450 (E.D. Va. 2010) (explaining that "the existence of coverage is a prerequisite to a bad faith claim under Virginia law").

In addition, the Court has already held that Plaintiffs' fraud claim fails as a matter of law in its decision denying the motion to remand. There, the Court concluded that Plaintiffs' "fraud claim against Showalter also fails on account of the source of duty rule." Dkt. 21 at 6–7. "Even taking all [Plaintiff's] allegations in [the] complaint as true and taking all reasonable inferences in its favor, [Plaintiff's] fraud claim does not support the existence of any duty Showalter had except as arose from the existence of the insurance policy, thereby precluding [Plaintiff] from asserting a claim for fraud." *Id.* at 7. The source of duty rule marks off "marks off 'the boundaries of civil liability' by precluding a party from recovering in tort from a defendant's breach of a contractual duty." *Landfall Tr. LLC v. Fidelity Nat'l Title Ins. Co.*, --- F. Supp. 3d ---,

2022 WL 17834051, at *7 (E.D. Va. Dec. 21, 2022) (quoting *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 255–56 (Va. 2019)). The rule aims to prevent "turning every breach of contract into a tort." *Tingler*, 834 S.E.2d at 255. It provides that "tort liability cannot be imposed upon a contracting party for failing to do a contracting task when no common-law duty of tort would have required him to do it anyway." *Id.* Plaintiffs argue that the duty not to defraud arises from the common law and not the Policy, Dkt. 49 at 16, and that argument is fair, as far as it goes. However, under Virginia law, "[w]here each particular misrepresentation alleged is related to a duty or an obligation required by a contract, those misrepresentations do not give rise to a cause of action for fraud." *Rattner v. Chubb Nat'l Ins. Co.*, No. 1:17-cv-136, 2017 WL 11500148, at *1 (E.D. Va. Sept. 28, 2017) (citing *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998)). So too here, Plaintiffs' allegations of misrepresentations by CIC all relate to duties or obligations required by the Policy. *See* Am. Compl. ¶¶ 96–101. For these reasons and those set forth in this Court's prior memorandum opinion, Plaintiffs' fraud claim fails as a matter of law. *See* Dkt. 21.

Finally, Plaintiffs have moved the Court to certify the question to the Supreme Court of Virginia: "*Whether Plaintiffs' complaint relating to a claim under a property insurance policy for loss and damage sustained during the SARS-CoV-2 crisis states a claim for relief under Virginia law for breach of contract.*" Dkt. 50 at 2. Plaintiffs argue that the Court should certify the question because the issue presents a "novel question[ ] of state law with no binding authority from the Supreme Court of Virginia or the Court of Appeals," and the Supreme Court of Virginia "is the entity with the power to speak dispositively on the issue" of state-law insurance coverage. *Id.* However, the Fourth Circuit in *Uncork* rejected a similar request to certify the question to the Supreme Court of Appeals of West Virginia. The court concluded that no state court decisions

13

had even "suggest[ed] that a 'physical loss' to property can occur without existing or impending 'material destruction' or 'material damage' to the covered property," and thus, the meanings of "physical loss" and "physical damage" in the relevant policy language were not ambiguous. *See Uncork*, 27 F.4th at 930, 933 & n.10.

To be sure, where a case presents "difficult and important issues of state law, a federal court may, in its discretion, exercise available state law procedure to certify the issue directly to the state's highest court," but "[r]egardless of the availability of [Supreme Court of Virginia] Rule 5:40's certification procedure, certification is never compelled." *Legard v. EQT Prod. Co.*, 771 F. Supp. 2d 607, 609 (W.D. Va. 2011). The Fourth Circuit's published decision in *Uncork* supplies the relevant rules of decision here and concluded that materially similar policy language was unambiguous and did not support a request to certify the question to the West Virginia court. And the Fourth Circuit has subsequently issued six unpublished opinions resolving similar issues denying claims to insurance coverage without direct physical loss to property. Especially in view of this precedent, the Court is not presented with a "difficult" question of state law to support certification. Since clear, consistent, and published Fourth Circuit precedent supply the rule of decision, the Court will decline to exercise its discretion to certify Plaintiffs' proposed question to the Supreme Court of Virginia.

For these reasons, in an accompanying Order, to follow, the Court will grant CIC's motion to dismiss, Dkt. 47, and deny Plaintiffs' motion to certify, Dkt. 50.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered this ___8th___ day of March, 2023.

*[signature: Norman K. Moon]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE